**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Alcon Laboratories, Inc., | Case No.   18cv2486 |
| Plaintiff, | |
| v. | **DEMAND FOR JURY TRIAL** |
| Allied Vision Group, Inc. and National Lens LLC, | |
| Defendants. | |

## COMPLAINT

Plaintiff Alcon Laboratories, Inc. ("Alcon") brings this action against Defendants Allied Vision Group, Inc. ("AVG") and National Lens LLC ("National Lens") (collectively, "Defendants") and alleges as follows:

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121 (action arising under the Lanham Act); 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 1338(a) (any Act of Congress relating to trademarks); and 28 U.S.C. § 1367 (supplemental jurisdiction).

2.      Defendants are subject to personal jurisdiction in this State because Defendants conduct business within this State, including shipments to individuals within this State of the products at issue in this case, ongoing relationships with resellers in this State, and a website accessible to customers in this State, and such conduct has caused injury to Alcon in this State. Because Defendants are subject to personal jurisdiction in this State, they are subject to personal jurisdiction in this District.

3.      Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2) in that a substantial part of the events giving rise to the claims occurred in this District and Defendants are subject to personal jurisdiction in this District.

## PARTIES

4.      Plaintiff Alcon, a division of Novartis AG, is a corporation organized and existing under the laws of the State of Delaware, having its corporate offices and principal place of business at 6201 South Freeway, Fort Worth, Texas 76134.

5.      On information and belief, Defendant Allied Vision Group, Inc. is a corporation wholly owned by New York-based Hammond, Kennedy, Whitney & Company, Inc., and is organized and existing under the laws of the State of Florida, having its principal place of business at 5350 N.W. 35th Avenue, Fort Lauderdale, Florida 33309.

6.      On information and belief, Defendant National Lens LLC is a limited liability company organized and existing under the laws of the State of Florida, having its principal place of business at 5350 N.W. 35th Avenue, Ft. Lauderdale, Florida 33309.

7.      On information and belief, Defendants Allied Vision Group, Inc. and National Lens LLC operate out of the same location and are, or have historically been, managed by the same individuals and entities.  On information and belief, Robert Tardell is the president of Allied Vision Group, Inc. and the president and managing member of National Lens LLC. Defendants jointly operate a nationwide interactive website, www.National-Lens.com, targeting ECPs throughout the country, including ECPs in New York, who can order individual boxes of lenses for their patients.

2

## STATEMENT OF FACTS

**A.     Alcon's Business**

8.      Alcon was founded in 1947 as a small pharmacy focused on sterile ophthalmic products.  It has developed into a world-renowned developer and manufacturer of contact lenses, prescription eye care products, surgical devices for eye care practitioners, and over-the-counter eye care products.  Its mission is to provide innovative products that enhance quality of life by helping people see better.  Alcon's focus is on patients, as seen in its advanced research and development process, as well as its high standards for manufacturing that exceed basic compliance needs.

9.      Alcon is also a strong advocate for eye health.  In 2017 alone, Alcon supported 554 charitable medical missions through Alcon Cares, Inc., a U.S. foundation, serving more than 392,000 patients around the world and facilitating approximately 34,000 surgeries.  Alcon also offers grants through the Alcon Foundation, Inc. to advance and improve the quality of eye health, education, and access to care, and has partnered for over 30 years with Orbis, an international charity that fights blindness, to enhance access to eye care services in the developing world through hands-on training and capacity-building.  Alcon also operates www.myeyes.com, an online resource for vision care for patients that allows them to explore how the eye works and actively manage their ocular health.

10.      Alcon is a leading producer of soft contact lenses in the U.S.  It sells contact lenses under several different brands, including DAILIES$^{®}$, which are its daily disposable soft contact lenses.  U.S. consumers of Alcon products have come to expect a high level of quality from Alcon, due in large part to the regimented and precise manner in which the products are manufactured, packaged, distributed, and marketed.

11.     Alcon has invested significant resources into conducting clinical trials of and obtaining FDA approval for each of its contact lens products.  It has also spent over 70 years and millions of dollars in advertising to establish and maintain consumer recognition and confidence in its brands, which rely in large part on recognition of, and confidence in, products bearing Alcon brand names.  These substantial expenditures of time, money, and effort have resulted in a reputation for exceptionally high-quality products, including contact lenses.  For example, Alcon's DAILIES TOTAL1® lenses won the "Contact Lens Product of the Year" award at the U.K.'s 2014 Optician Awards.  Its CLEAR CARE® PLUS with HYDRAGLYDE® contact lens solution was awarded Product of the Year in the Eye Care category of the 2016 Consumer Survey of Product Innovation.

12.     Alcon vigorously protects its reputation and goodwill by maintaining the highest standards in products, appearance, and customer service.

13.     Alcon does not dictate the pricing of its products.  Alcon's pricing is determined by market forces and independent decisions made by online and brick-and-mortar retailers selling legal, compliant products that do not infringe on Alcon's intellectual property rights.

**B.      Alcon Has Extensive Connections with New York**

14.     Although Alcon is headquartered in Texas, it is a global company with business partners and customers all around the world.  In particular, Alcon conducts significant business throughout the state of New York.

15.     Alcon's National Account Director of e-Commerce, Richard Fabio, lives on Long Island, New York.  Mr. Fabio is responsible for developing the Alcon Vision Care Lens and Lens Care businesses and executing sales strategies within assigned internet commerce accounts. Mr. Fabio will be a key witness in this case because much of Defendants' infringing conduct

4

involves e-commerce, as it results from purchases from online resellers of Alcon's products or through Defendants' National-Lens.com website.

16.     Alcon contracts with thousands of retailers and eye care practitioners ("ECPs") in New York to sell Alcon contact lenses throughout the state.  In 2017, Alcon sold nearly $15 million of Alcon contact lenses directly to ECPs located in New York.

17.     Alcon has dozens of employees who live and work in New York, including approximately 17 members of the Alcon Vision Care Lens sales team.  In addition to meeting with individual ECPs to promote and sell Alcon contact lenses, members of the Alcon Vision Care Lens sales team, including those based in New York, regularly attend meetings, conferences, and other events in New York.

18.     VisionExpo is the leading vision care conference in the United States.  It hosts a VisionExpo East conference each year in New York and a VisionExpo West conference each year in Las Vegas.  Alcon has attended and had booths at both conferences every year to promote its contact lens products and, until this year, its ophthalmic pharmaceutical products.

19.     Just last month, March 2018, both Alcon and Novartis Pharmaceuticals hosted prominent booths at VisionExpo East, solidifying and expanding their connections with New York-based customers, retailers, distributors, and ECPs.  During the conference, Alcon participated in nearly 100 meetings and events in New York City to continue deepening its relationships with ECPs, customers, and other members of the vision care industry.  These meetings included meetings with EZ Contacts.com ("EZ Contacts"), a New York-based entity.

**C.     Background on Contact Lenses**

20.     Today, nearly 40 million Americans wear contact lenses to correct refractive vision defects.  Contact lenses are medical devices regulated by the U.S. Food and Drug

Administration to ensure their safety and efficacy.  According to their labeling, contact lenses require professional care, and thus patients can only obtain them with a valid prescription.

21.     In the United States, about 90 percent of contact lens wearers wear soft contact lenses, which are generally made of soft, flexible, water absorbing plastics or silicone-hydrogel material that allow higher amounts of oxygen to pass through to the cornea.  Most soft contact lenses are replaced daily, weekly, or monthly.

22.     Each contact lens manufacturer uses unique manufacturing processes and most often unique materials to produce its contact lenses.  The manufacturing process and material affect how contact lenses fit, how they correct vision, and the level of comfort they provide.  Moreover, different contact lens brands vary on such features as base curve (the back curvature of the contact lens, measured in millimeters), diameter (the distance across a lens between one edge of the contact lens to the other edge), material (chemical make-up of the plastic), lens shape (type of curvatures on the front and back surfaces of the lens), flexure (flexibility of the lens on the eye), oxygen transmissibility (amount of oxygen that passes through the lens), water content (percentage of water/solution absorbed by the lens material), surface wettability (ease with which tears adhere to the lens surface), center thickness (thickness at the center of the lens), edge thickness (thickness at edge of the lens), edge design (shape of the lens edge), surface characteristics/treatments, UV blocking, and interaction with lens care solutions.

23.     Different combinations of these features affect the fit, efficacy, and safety of patients' contact lenses.  Thus, the professional judgment of an eye care practitioner, such as an optometrist or ophthalmologist, is required to select the appropriate pair of contact lens for each patient.  In particular, soft contact lenses should cover the cornea adequately and center properly,

while also being able to move enough to flush cellular and tear debris from behind the lenses; remain stable on the eye; transmit oxygen; and optically correct vision.

### D.    Federal Regulation of Contact Lens Sellers

24.     The Fairness to Contact Lens Consumers Act ("FCLCA"), 15 U.S.C. §§ 7601-7619, and its implementing regulation, the Contact Lens Rule ("CLR"), 16 C.F.R. § 315, set forth specific requirements for third-party sellers of contact lenses.  Under the statute, a contact lens seller may only sell contact lenses to a patient with a valid prescription.  Among other things, the statute requires contact lens sellers to verify contact lens prescriptions with patients' prescribers and prohibits contact lens sellers from altering contact lens prescriptions.  As explained above, the prescription must include the power, the material or manufacturer or both, the base curve or appropriate designation, and the diameter of the lenses, as well as the expiration date of the prescription.

25.     To obtain contact lenses from a third-party seller, a patient must either present her contact lens prescription to the seller or the seller must verify the prescription with the prescriber. For the latter option, the seller must provide certain information about the prescription to the patient's prescriber, including the contact lens power, manufacturer, base curve or appropriate designation, and diameter.  The prescription is considered verified under the FCLCA if either (1) the prescriber directly confirms that the prescription is accurate to the seller or (2) the prescriber fails to communicate with the seller within eight business hours after receiving the required information ("passive verification").  If the prescriber informs the seller that the prescription is inaccurate, expired, or otherwise invalid, the seller cannot fill it.

26.     The U.S. Food and Drug Administration regulates daily wear (lenses that are removed each night) contact lenses as Class II (moderate- to high-risk) medical devices and extended wear (lenses that are worn for periods of six nights up to 30 nights) as Class III (high-

7

risk).  In its "Focusing on Contact Lens Safety" Consumer Update, the FDA includes the

following information regarding prescriptions:

> With a valid prescription, it is possible to purchase contact lenses from pharmacies, optical retailers, and online optical retailers.  But be extremely cautious when buying contacts from someone other than your eye care professional.
>
> Contact lenses are NOT over-the-counter (OTC) devices. Companies that sell them as such are misbranding the device and violating FTC regulations by selling contact lenses without having your prescription.

https://www.fda.gov/ForConsumers/ConsumerUpdates/ucm048893.htm.

　　　　27.　　The FDA provides the following additional important safety information for

consumers who may have their prescriptions filled by third parties:

> Make sure that you get the exact brand, lens name, power, sphere, cylinder (if any), axis (if any), diameter, base curve, and peripheral curves (if any) noted on the prescription.  If you think you've received an incorrect lens or brand, check with your eye care professional.  (The correct brand is important because there are differences in the water content and shape among the brands.) Don't accept any substitution unless your eye care professional approves it.

*Id.*

**E.   Alcon's DAILIES AQUACOMFORT PLUS®, O2 OPTIX®, FRESHLOOK® COLORBLENDS®, and AIR OPTIX® plus HYDRAGLYDE® Contact Lenses**

**i.   DAILIES AQUACOMFORT PLUS® Products**

28.    Beginning in May 2017, Alcon introduced new product packaging for its

DAILIES AQUACOMFORT PLUS® sphere contact lenses distributed in the United States, a

product that is often prescribed to patients who have not previously worn soft contact lenses.

**90-Pack Front of Packaging**          **90-Pack Back of Packaging**






**30-Pack Front of Packaging**          **30-Pack Back of Packaging**

29.     The new product packaging includes several new patient-friendly educational elements, including (i) readily accessible detailed insertion and removal instructions, (ii) a toll-free patient helpline and email address to permit patients to contact Alcon directly with questions, and (iii) a dedicated DAILIES® website address for more at-home and online support.



30.     To enhance its ability to communicate with eye care practitioners and patients regarding issues that might affect the safety or efficacy of its products, Alcon also added U.S.-specific lot numbers to this packaging.  These lot numbers can be used by Alcon to track its products through its supply chain in the event that Alcon needs to notify eye care practitioners or patients regarding any issues related to the safety or efficacy of the lenses, including, for example, any inaccuracies in the corrective power of the lenses.



31.     Alcon also updated the design of the front panel of the packaging, including the addition of its LIGHTSTREAM® technology trademark.



32.     Finally, so that U.S. patients and eye care practitioners can readily confirm that they are receiving the benefits of the new product packaging, Alcon added an American flag to the packaging.



12

33.     Alcon first announced the new packaging to the eye care industry in a media alert issued on November 12, 2016, and sent additional follow-up communications regarding the packaging change to customers, authorized distributors, retailers, and eye care practitioners starting in spring 2017.  Alcon did not limit these communications to entities with whom it had a direct relationship because it wanted everyone who sold DAILIES AQUACOMFORT PLUS® lenses to have advance notice of the packaging change so that they would have adequate time to update their inventory with the new products.

34.     Beginning in May 2017, Alcon began to provide DAILIES AQUACOMFORT PLUS® lenses with the updated packaging directly to larger customers, such as Walmart and Costco, to authorized distributors, and to retailers with whom it has reseller agreements.  To prevent confusion that could result if two different versions of the DAILIES AQUACOMFORT PLUS® lens packaging were available in the marketplace at the same time, and to make sure that all patients would receive the benefits of the additional information on the new packaging, Alcon required all customers, authorized distributors, and retailers with whom it had a contract to stop selling any DAILIES AQUACOMFORT PLUS® products in the prior packaging by June 16, 2017.  They could then exchange any remaining products in their inventory for products in the new DAILIES AQUACOMFORT PLUS® packaging.  Alcon's sales representatives worked directly with eye care practitioners to assist in exchanging any older product in their inventories for products with the updated packaging.

35.     Alcon also provided customers, authorized distributors, retailers with whom it had contracts, and ECPs with photographs (i.e., box shots) and other marketing materials featuring the new packaging for the DAILIES AQUACOMFORT PLUS® products and asked that they

update their marketing materials.  These marketing materials were made available to Alcon's

partners through its marketing portal website at www.alconODmarketing.com.

36.     During July 2017, Alcon also sent letters to retailers with whom it did not have a

relationship reminding them of the packaging change and informing them that the older

DAILIES AQUACOMFORT PLUS® product packaging was not authorized for sale in the

United States after June 16, 2017.

37.     To assure compliance with its requirement that products in the prior packaging be

exchanged for products in the new packaging, Alcon carefully monitored the return process for

DAILIES AQUACOMFORT PLUS® products, and, during July 2017, sent letters to customers,

authorized distributors, retailers under contract, and ECPs whom it believed had not returned

their inventory of DAILIES AQUACOMFORT PLUS® products in the prior packaging.  On

information and belief, substantially all of the prior DAILIES AQUACOMFORT PLUS®

products were exchanged by Alcon's customers, authorized distributors, retailers under contract,

and ECPs by July 31, 2017, but not quite all.  Accordingly, Alcon sent a further communication

to all customers, retailers with whom it had contracts, and eye care practitioners reminding them

of the importance of exchanging products in the prior packaging in their inventory for products

with the updated packaging.  Alcon also informed them that continued sales of DAILIES

AQUACOMFORT PLUS® products with the older packaging would likely confuse patients and

would be considered trademark infringement in the United States.

38.     Further, Alcon regularly reviewed the websites of its customers, authorized

distributors, retailers under contract, and eye care practitioners to ensure that they had removed

any depictions of the older DAILIES AQUACOMFORT PLUS® products.  To the extent that

they had not, Alcon contacted them during the summer of 2017 to remind them of the packaging

14

change and to reiterate that the marketing materials and websites needed to be updated to show only the DAILIES AQUACOMFORT PLUS® products with the updated packaging.

### ii.        O2 OPTIX® Products

39.        Another contact lens product that Alcon manufactures is the O2 OPTIX® product. In an effort to streamline its product line, Alcon discontinued providing complimentary "fit sets" for the O2 OPTIX® lenses to eye care practitioners in the United States for use in fitting patients with O2 OPTIX® contact lenses in 2011.  Because eye care practitioners do not normally prescribe contact lenses without first doing a fitting with a complimentary fit set, Alcon stopped distributing the O2 OPTIX® products in the United States about two years later, in 2013.  Alcon now distributes the O2 OPTIX® products only in certain countries outside of the United States.

### iii.        FRESHLOOK® COLORBLENDS® Products

40.        Alcon also offers colored contact lenses that allow patients to change the appearance or color of their eyes.  It markets some of these products under the FRESHLOOK® COLORBLENDS® trademarks.  Although some of the FRESHLOOK® COLORBLENDS® lenses do not correct vision, all are subject to the Alcon fitting guidelines and the FCLCA and need to be prescribed by a licensed eye care practitioner.  Alcon markets these products in the United States in boxes that contain six lenses each.  Because of the different market conditions outside of the United States, Alcon markets these products in 2-packs only outside of the United States.

41.        Over the years, a market has developed for counterfeit contact lenses, including in the United States, particularly for non-corrective colored contact lenses.  Alcon regularly works with U.S. Customs and law enforcement to seize counterfeits of its FRESHLOOK® COLORBLENDS® products.  Many of the counterfeit products come in packaging that looks much like genuine packaging and these counterfeits are regularly sold in the 2-pack size.

Further, some feature colors that are not true to the colors in genuine FRESHLOOK®
COLORBLENDS® products.

### iv.      AIR OPTIX® plus HYDRAGLYDE® Products

42.      In January 2018, Alcon introduced new U.S.-specific packaging for its AIR
OPTIX® plus HYDRAGLYDE® contact lenses:



43.      The new U.S.-specific AIR OPTIX® plus HYDRAGLYDE® boxes feature many
of the same benefits as the new DAILIES AQUACOMFORT PLUS® boxes, including (i) readily
accessible detailed insertion and removal instructions, (ii) a toll-free patient helpline and email
address to permit patients to contact Alcon directly with questions, and (iii) a dedicated AIR
OPTIX® website address for more at-home and online support.   So that U.S. patients and eye
care practitioners can readily confirm that they are receiving the benefits of the new product
packaging, Alcon added an American flag to the new U.S.-specific AIR OPTIX® plus
HYDRAGLYDE® boxes.

44.      The new U.S.-specific AIR OPTIX® plus HYDRAGLYDE® packaging differs
from the "Global" packaging for AIR OPTIX® plus HYDRAGLYDE® lenses, which was newly
introduced in 2016 and which has never been distributed by Alcon in the U.S.  The Global
packaging conforms to regulations in Canada, the European Union, Australia, and Japan, and is
distributed by Alcon only in those countries:



In addition to differences in the graphics on the front of the boxes, the Global AIR OPTIX® plus HYDRAGLYDE® boxes do not have (i) detailed insertion and removal instructions, (ii) a toll-free patient helpline and email address, (iii) a dedicated AIR OPTIX® website address, or (iv) an identifying American flag.

45.     Additionally, the new U.S.-specific packaging differs from the "Rest of World" packaging for AIR OPTIX® plus HYDRAGLYDE® lenses.  The Rest of World AIR OPTIX® plus HYDRAGLYDE® packaging, which was launched in July 2017, conforms with regulations in all countries *except* the U.S., Canada, the European Union, Australia, and Japan, and are offered for sale only outside of the U.S., Canada, the European Union, Australia, and Japan:



In addition to differences in the graphics on the front of the boxes, the Rest of World AIR OPTIX® plus HYDRAGLYDE® boxes do not have (i) detailed insertion and removal instructions, (ii) a toll-free patient helpline and email address, (iii) a dedicated AIR OPTIX® website address, or (iv) an identifying American flag.

### F.     Alcon's Quality Control Processes

46.     Alcon contact lenses are subjected to a variety of inspections and tests as part of the manufacturing process.  If any standard is not met, the entire batch, which may include up to 25,000 lenses, is scrapped.  If a batch passes, each lens is placed in a blister pack and covered with foil, which is heat sealed.  The packs are autoclaved for sterilization.  Alcon also tests its lenses to make sure they meet the applicable regulatory standards where they will be sold.  Alcon determines distribution channels after confirming which standards its lenses meet, and segregates them in its supply chain management system according to distribution channel.  With respect to

17

products that Alcon does not distribute in the United States, such as O2 OPTIX® lenses and the AIR OPTIX® plus HYDRAGLYDE® lenses in non-U.S. packaging, Alcon only tests them for compliance with the applicable standards in the markets in which they will be distributed.

47.     Moreover, Alcon takes several additional steps to make sure its lenses are not contaminated.  To start, it uses specialized warehouses that are regularly audited by Alcon and various health authorities, including the FDA.  In addition, it uses only new, heat-treated wood pallets to avoid the cross-contamination that can occur if contact lenses are stored on reused pallets that previously stored toxic chemicals or became moldy.

### G.     Alcon's Intellectual Property Rights

48.     Alcon has taken all appropriate steps to protect its rights in the trademarks and trade dress used for its DAILIES AQUACOMFORT PLUS® products, O2 OPTIX® products, FRESHLOOK® COLORBLENDS® products, and AIR OPTIX® plus HYDRAGLYDE® products.  Specifically, Alcon owns the registrations and applications set forth below for its ALCON® mark (collectively, the "ALCON Marks").

49.     Alcon owns U.S. Trademark Registration No. 1,055,870 for the mark ALCON® for "cleaning, wetting, and soaking solutions for contact lenses," which issued on January 11, 1977.  Alcon filed an affidavit under Section 15 of the Lanham Act on July 30, 1982, which was acknowledged by the United States Patent and Trademark Office.  As a result, the registration is incontestable and considered to be conclusive evidence of the validity of the mark and registration, and of Alcon's exclusive right to use the ALCON® trademark for the registered goods.

50.     Alcon owns U.S. Trademark Registration No. 3,964,835 for the stylized ALCON® mark shown below for "cleaning, wetting, and soaking solutions for contact lenses," which issued on May 24, 2011.  Alcon filed an affidavit under Section 15 of the Lanham Act on

18

October 26, 2016, which was acknowledged by the United States Patent and Trademark Office. As a result, the registration is incontestable and considered to be conclusive evidence of the validity of the mark and registration, and of Alcon's exclusive right to use the stylized ALCON® trademark for the registered goods.



51.     Alcon owns U.S. Trademark Registration No. 4,560,685 for the mark ALCON® for "contact lenses," which issued on July 1, 2014.  The registration is considered to be prima facie evidence of the validity of the mark and registration, and of Alcon's exclusive right to use the ALCON® trademark for the registered goods.

52.     Alcon also owns U.S. Trademark Registration No. 5,412,293 for the stylized ALCON mark shown below for "contact lenses," which issued on February 27, 2018.  This application was filed on July 26, 2017, and claims a first use anywhere and first use in commerce date of December 31, 2013.



53.     Alcon also owns four copyrights in the DAILIES AQUACOMFORT PLUS® packaging visual artwork.  Two of these copyrights have been registered under Register Numbers VA 2-090-281 and VA 2-090-283.  Alcon has filed applications to register the additional copyrights, include Copyright Case Nos. 1-5682214719 and 1-5682214531.

ny-1324494

54.     Alcon's parent, Novartis AG, owns the registrations and application below for marks that are used on Alcon's DAILIES AQUACOMFORT PLUS® products (collectively, the "ALCON DACP Marks").

55.     Novartis owns U.S. Trademark Registration No. 5,137,710, for the mark AQUACOMFORT PLUS® for "contact lenses," which issued on February 7, 2017.  The registration is considered to be prima facie evidence of the validity of the mark and registration, and of Alcon's exclusive right to use the AQUACOMFORT PLUS® trademark for the registered goods.

56.     Novartis also owns U.S. Registration No. 4,556,224, for the Teardrop Logo shown below for "contact lenses," which issued on June 24, 2014.  The registration is considered to be prima facie evidence of the validity of the mark and registration, and of Alcon's exclusive right to use the Teardrop Logo for the registered goods.



57.     Novartis also owns U.S. Trademark Registration No. 3,687,534, for the mark AQUACOMFORT® for "contact lenses," which issued on September 22, 2009.  Novartis filed an affidavit under Section 15 of the Lanham Act on September 9, 2015, which was acknowledged by the United States Patent and Trademark Office.  As a result, the registration is incontestable and considered to be conclusive evidence of the validity of the mark and

ny-1324494

registration, and of Novartis' exclusive right to use the AQUACOMFORT® trademark for the registered goods.

58. Novartis also owns U.S. Trademark Registration No. 2,924,933, for the mark LIGHTSTREAM® for "contact lenses and optical lenses," which issued on February 8, 2005. Novartis filed an affidavit under Section 15 of the Lanham Act on December 27, 2014, which was acknowledged by the United States Patent and Trademark Office. As a result, the registration is incontestable and considered to be conclusive evidence of the validity of the mark and registration, and of Novartis' exclusive right to use the LIGHTSTREAM® trademark for the registered goods.

59. Novartis also owns U.S. Registration No. 3,555,421 for the mark DAILIES AQUACOMFORT PLUS® for "contact lenses," which issued on December 30, 2008. Novartis filed an affidavit under Section 15 of the Lanham Act on October 24, 2014, which was acknowledged by the United States Patent and Trademark Office. As a result, the registration is incontestable and considered to be conclusive evidence of the validity of the mark and registration, and of Novartis' exclusive right to use the DAILIES AQUACOMFORT PLUS® trademark for the registered goods.

60. Novartis also owns U.S. Application Serial No. 87/586,440 for the trade dress for the front panel of the DAILIES AQUACOMFORT PLUS® products shown below for "contact lenses." This application was filed on August 28, 2017, and claims a first use anywhere and first use in commerce date of May 31, 2017. This application was published for opposition in the *Official Gazette* on April 10, 2018. If no opposition is filed, the trade dress will be registered by the United States Patent and Trademark Office in about four months.



61.     Novartis also owns the registrations below for marks that are used on Alcon's O2 OPTIX® products (collectively, the "O2 OPTIX Marks").

62.     Novartis owns U.S. Registration No. 2,946,628 for the mark O2® for "contact lenses," which was issued on May 3, 2005.   Novartis filed an affidavit under Section 15 of the Lanham Act on February 19, 2001, which was acknowledged by the United States Patent and Trademark Office.  As a result, the registration is incontestable and considered to be conclusive evidence of the validity of the mark and registration, and of Novartis' exclusive right to use the O2® trademark for the registered goods.

63.     Novartis owns U.S. Registration No. 3,308,130 for the mark O2 OPTIX® for "contact lenses," which issued on October 9, 2007.  Novartis filed an affidavit under Section 15 of the Lanham Act on December 31, 2016, which was acknowledged by the United States Patent and Trademark Office.  As a result, the registration is incontestable and considered to be conclusive evidence of the validity of the mark and registration, and of Novartis' exclusive right to use the O2 OPTIX® trademark for the registered goods.

64.     Novartis owns U.S. Registration No. 3,308,131 for the stylized O2 OPTIX® mark shown below for "contact lenses," which issued on October 9, 2007.  Novartis filed an affidavit under Section 15 of the Lanham Act on December 31, 2016, which was acknowledged by the

United States Patent and Trademark Office.  As a result, the registration is incontestable and considered to be conclusive evidence of the validity of the mark and registration, and of Novartis' exclusive right to use the stylized O2 OPTIX® trademark for the registered goods.



65.     Novartis also owns the registrations below for marks that are used on Alcon's FRESHLOOK® COLORBLENDS® products (collectively, the "FRESHLOOK COLORBLENDS Marks").

66.     Novartis owns U.S. Registration No. 2,888,957 for the mark FRESHLOOK® for "contact lenses," which issued on September 28, 2004.  Novartis filed an affidavit under Section 15 of the Lanham Act on October 6, 2014, which was acknowledged by the United States Patent and Trademark Office.  As a result, the registration is incontestable and considered to be conclusive evidence of the validity of the mark and registration, and of Novartis' exclusive right to use the FRESHLOOK® trademark for the registered goods.

67.     Novartis owns U.S. Registration No. 2,251,945 for the mark FRESHLOOK COLOR BLENDS® for "contact lenses," which issued on June 8, 1999.  Novartis filed an affidavit under Section 15 of the Lanham Act on June 26, 2009, which was acknowledged by the United States Patent and Trademark Office.  As a result, the registration is incontestable and considered to be conclusive evidence of the validity of the mark and registration, and of Novartis' exclusive right to use the FRESHLOOK COLOR BLENDS® trademark for the registered goods.

ny-1324494

68.     Novartis owns U.S. Registration No. 2,340,808 for the mark COLORBLENDS® for "contact lenses," which issued on April 11, 2000.  Novartis filed an affidavit under Section 15 of the Lanham Act on June 9, 2010, which was acknowledged by the United States Patent and Trademark Office.  As a result, the registration is incontestable and considered to be conclusive evidence of the validity of the mark and registration, and of Novartis' exclusive right to use the COLORBLENDS® trademark for the registered goods.

69.     Novartis also owns the registrations below for marks that are used on Alcon's AIR OPTIX® plus HYDRAGLYDE® products (collectively, the "AIR OPTIX plus HYDRAGLYDE Marks").

70.     Novartis owns U.S. Registration No. 3,490,248 for the mark AIR OPTIX® for "contact lenses," which was issued on August 19, 2008.  Novartis filed an affidavit under Section 15 of the Lanham Act on June 7, 2005, which was acknowledged by the United States Patent and Trademark Office.  As a result, the registration is incontestable and considered to be conclusive evidence of the validity of the mark and registration, and of Novartis' exclusive right to use the AIR OPTIX ® trademark for the registered goods.

71.     Novartis owns U.S. Registration No. 5,186,616 for the mark HYDRAGLYDE® for "contact lenses," which issued on April 18, 2017.  The registration is considered to be prima facie evidence of the validity of the mark and registration, and of Novartis' exclusive right to use the HYDRAGLYDE® trademark for the registered goods.

72.     Novartis owns U.S. Registration No. 5,146,779 for the mark AIR OPTIX PLUS HYDRAGLYDE® for "contact lenses," which issued on February 21, 2017.  The registration is considered to be prima facie evidence of the validity of the mark and registration, and of

24

Novartis' exclusive right to use the AIR OPTIX PLUS HYDRAGLYDE® trademark for the registered goods.

73.    Novartis also owns U.S. Application Serial No. 87/835,553 for the trade dress shown below for "contact lenses."  This application was filed on March 15, 2018.



74.    Novartis also owns U.S. Registration No. 3,429,280 for the CIBA VISION® mark for "contact lenses," which issued on May 20, 2008.  Novartis filed an affidavit under Section 15 of the Lanham Act on November 7, 2017, which was acknowledged by the United States Patent and Trademark Office.  As a result, the registration is incontestable and considered to be conclusive evidence of the validity of the mark and registration, and of Novartis' exclusive right to use the CIBA VISION® trademark for the registered goods.  The CIBA VISION® mark is used on the packaging for the FRESHLOOK® COLORBLENDS® and O2 OPTIX® lenses.

75.    Novartis also owns U.S. Registration No. 4,425,860 for the stylized CIBA VISION® mark shown below for "contact lenses," which issued on October 29, 2013.  The registration is considered to be prima facie evidence of the validity of the mark and registration, and of Novartis' exclusive right to use the stylized CIBA VISION® trademark for the registered goods.  The stylized CIBA VISION® mark is also used on the packaging for the FRESHLOOK® COLORBLENDS® and O2 OPTIX® lenses.



ny-1324494

76.     As a result of Alcon's expenditures and efforts, the ALCON Marks, the ALCON DACP Marks, the O2 OPTIX Marks, the FRESHLOOK COLORBLENDS Marks, the AIR OPTIX plus HYDRAGLYDE marks, the CIBA VISION mark, and the stylized CIBA VISION mark (collectively, "the ALCON Contact Lens Marks") have come to signify the high quality of Alcon's contact lens products.  They have incalculable reputation and goodwill, belonging exclusively to Alcon and its parent, Novartis AG.

**H.     Defendants' Business and Wrongful Conduct**

**i.     Defendants' Business and New York Contacts**

77.     Defendants' business consists of at least three parts:  *First*, on information and belief, Defendants sell contact lenses wholesale to ECPs and resellers throughout the country, including to ECPs and resellers in New York.  *Second*, on information and belief, Defendants do business with resellers, including resellers based in New York, to fulfill orders from individual customers—including those in New York—on behalf of those resellers.  *Third*, Defendants jointly operate a highly interactive website website, www.National-Lens.com, targeting ECPs throughout the country, including ECPs in New York, who can order individual boxes of lenses for their patients.  On information and belief, through these three lines of business, Defendants transact significant business with resellers, customers, and ECPs in New York, including in this District.

78.     Defendants regularly import contact lenses—including the Alcon lenses at issue in this lawsuit—into the United States from India.  Defendant AVG imports hundreds of thousands of dollars' worth of contact lenses into the United States each year through John F. Kennedy International Airport in Queens, New York.

26

79.     Additionally, on information and belief, Defendant AVG works with several New York-based resellers, including LD Vision Group Inc. ("LD Vision") and EZ Contacts, fulfilling contact lens orders on their behalf.  LD Vision's U.S. headquarters is in Buffalo, New York.  It operates several websites, including www.lensdiscounters.com, www.opticontacts.com, www.postalcontacts.com, www.lens247.com, and www.contacts1st.com.  EZ Contacts is based in Brooklyn, New York and operates at least two websites, www.ezcontacts.com and www.ezcontactsusa.com.

80.     Further, Defendants jointly operate the interactive website www.national-lens.com, which by its very name has an intended nationwide audience.  Defendants' website can be accessed by anyone in the United States, allowing potential ECP customers to view Defendants' current inventory and select their desired lenses for purchase.  Any ECP in the United States can easily create an account at www.national-lens.com by entering her billing and shipping information as well as her medical credentials.  Once an ECP creates an account, she can order contact lenses directly through the website—to be shipped anywhere in the United States, including to New York.  If an ECP has a question or concern for Defendants, she can use the "Contact Us" online inquiry form embedded directly within the website, or contact Defendants through the toll-free telephone number or email address listed on the website.

81.     On information and belief, Defendants have sold and continue to sell and ship numerous contact lens orders from their national website, including the Alcon lenses at issue in this case, to ECPs throughout New York, including in this District.

82.     Defendants regularly place advertisements for their contact lens business in vision care periodicals, including periodicals published by New-York based Jobson Medical Information LLC.  On information and belief, these Jobson periodicals are distributed throughout

27

ny-1324494

the United States, including in New York.  Just last month, in the March 2018 edition of *20/20*
magazine, Defendant National Lens ran a contact lens advertisement promoting itself as
"Americas Leading Discount Optical Distributor."  The *20/20* magazine is published 14 times
per year, and circulates to nearly 1,500 readers in New York state alone.

83.     Trevi Coliseum is an Italian company that attends VisionExpo East in New York
every year.  National Lens is its exclusive North American distributor for eyeglasses frames.
Because National Lens is Trevi Coliseum's exclusive North America distributor, Alcon believes
that National Lens has met with Trevi at VisionExpo East in New York and that some of the
Trevi products distributed by National Lens are sold to ECPs in New York, including in this
District.

84.     AVG Chief Executive Officer Harvey Berkowitz has attended vision care
conferences around the United States and the world, and recently attended the MIDO Eyewear
Show in Milan, Italy, where he touted AVG's growing footprint throughout the United States.
*See Allied Vision Group – Harvey Berkowitz, President and CEO*, YOUTUBE, Feb. 25, 2018,
https://www.youtube.com/watch?v=e-aSljMqEhc.  On information and belief, Mr. Berkowitz
and/or other employees of Defendants attend other vision care conferences, including vision care
conferences in New York.

85.     Finally, AVG has previously hired and worked with lawyers and advisors in New
York in connection with business transactions.  In particular, AVG hired New York-based
investment banking advisors Parcrest Advisors and attorneys from the New York office of the
law firm Vedder Price P.C. in connection with AVG's acquisition by New York-based private
equity firm Hammond, Kennedy, Whitney & Company, Inc. in 2017.

ii.        **Defendants' Sales and Shipments of Alcon Products**

a)        **DAILIES AQUACOMFORT PLUS® Shipments**

86.        Beginning on August 1, 2017, Alcon conducted test buys to assure that only products in updated DAILIES AQUACOMFORT PLUS® packaging were being sold in the United States.  It purchased products from a variety of online sources, including retailers who had contracts with Alcon and retailers who were not under contract with Alcon.  While the majority of the retailers shipped DAILIES AQUACOMFORT PLUS® products in the updated and authorized packaging, a handful of them did not, including saveonlens.com, contactfill.com, contactlens.com, and five websites operated by LD Vision.  On information and belief, each of those retailers had Defendant AVG fulfill the orders, and AVG shipped DAILIES AQUACOMFORT PLUS® products in packaging that is not authorized for sale in the United States.

87.        Based upon Alcon's test buys, Alcon has determined that AVG has filled multiple contact lens orders sent to purchasers in New York, including shipments of DAILIES AQUACOMFORT PLUS® products in the prior packaging, and continues to ship such products to New York, including into this District.  For example, AVG fulfilled a New York order placed with saveonlens.com as recently as December 29, 2017 by shipping DAILIES AQUACOMFORT PLUS® products in the prior packaging to an address in this District.  In addition, on information and belief, when Defendants ship DAILIES AQUACOMFORT PLUS® products to ECPs, including those in New York, they ship DAILIES AQUACOMFORT PLUS® products in the prior packaging that is not authorized for sale in the United States.

88.        The packaging for some DAILIES AQUACOMFORT PLUS® products that Defendants are selling in the United States is materially different from the packaging for products that Alcon has authorized for sale in the United States and that are being sold by

29

distributors and resellers who exchanged their older product inventory for products with the updated packaging in 2017.  Specifically, the products sold by Defendants lack (i) U.S.-specific lot numbers, (ii) readily accessible detailed insertion and removal instructions, (iii) a toll-free patient helpline and email address to permit patients to more easily contact Alcon directly with questions, (iv) a dedicated DAILIES® website address for more at-home and online support, and (v) the American flag.  Additionally, the packaging for the DAILIES AQUACOMFORT PLUS® products sold by Defendants retains content that Alcon no longer features on its U.S.-specific DAILIES AQUACOMFORT PLUS® sphere product, including text in languages other than English and Spanish, as well as Japanese regulatory text and a registration number.  Both the front and back of the packaging differ from the authorized DAILIES AQUACOMFORT PLUS® packaging, as shown below.

|  **Alcon Packaging**  |  **Packaging used by AVG**  |





89.     Another material difference between the DAILIES AQUACOMFORT PLUS®
lenses that Alcon distributes in the United States and at least some shipments of DAILIES
AQUACOMFORT PLUS® lenses by AVG is the lack of prescription verification.  Proper
verification requires either that the patient present a copy of the prescription to the contact lens
seller or that the contact lens seller communicate with the eye care practitioner to verify the
prescription information.  Alcon has confirmed through numerous test buys that AVG fulfills
some contact lens orders for patients whose prescriptions have not been verified.

90.     This lack of prescription verification in connection with some of AVG's
shipments runs counter to the FCLCA and CLR's current requirements, raising health and safety
concerns for consumers due to the risks associated with wearing non-prescribed contact lenses,
as described above.

91.     Defendants' sales of products in packaging that is materially different from the
DAILIES AQUACOMFORT PLUS® packaging that Alcon distributes in the United States cause
consumers to be confused, or to believe that the packaging sold by Defendants is the same as the
DAILIES AQUACOMFORT PLUS® product packaging sold by Alcon in the United States,
when it is not.  As such, Defendants' sales of DAILIES AQUACOMFORT PLUS® products in
prior packaging violate Sections 32 and 43(a) of the Lanham Act.

92.     Defendants' sales of DAILIES AQUACOMFORT PLUS® products in packaging
that differs from the products that Alcon distributes in the United States also deprive contact lens
patients in the United States of important safety and usage information that Alcon includes on
the packaging that it uses for the DAILIES AQUACOMFORT PLUS® products that are
distributed in the United States.  Defendants' sales of such products also deprive Alcon of the
ability to rely on its U.S.-specific lot number system to notify U.S. eye care practitioners and

patients in the event that there is an issue with any of its DAILIES AQUACOMFORT PLUS®
lenses.  Each of these consequences, among others, negatively impacts the safety and well-being
of contact lens consumers and harms Alcon's reputation and goodwill.

### b)      O2 OPTIX® and FRESHLOOK COLORBLENDS® Sales

93.      In addition to shipping to consumers DAILIES AQUACOMFORT PLUS®
products with the older packaging, Defendants are selling two other products that Alcon does not
distribute in the United States.  First, according to the national-lens.com website, Defendants are
selling O2 OPTIX® lenses even though Alcon stopped selling those products in the United States
in 2013 and no longer supports those products in the United States.  Second, and also according
to the national-lens.com website, Defendants are selling FRESHLOOK® COLORBLENDS®
contact lenses in a 2-pack size that Alcon does not distribute for sale in the United States and that
is sometimes the subject of counterfeiting.

94.      Until Alcon filed its complaint in this case, the home page on the national-
lens.com website prominently featured Alcon's FRESHLOOK® COLORBLENDS® 2-pack
product, claiming that it is "Now Available in 2 Packs," as shown below, when Alcon does not
distribute FRESHLOOK® COLORBLENDS® 2-pack products in the United States.  By
advertising that FRESHLOOK® COLORBLENDS® products are "now available" in 2-packs,
Defendants have led customers to believe that such lenses are approved for sale in the United
States, when they are not.



95.    Additionally, Defendants' website shows that Defendants continue to sell O2 OPTIX® products throughout the United States, including in New York, through their nationwide interactive website, even though Alcon discontinued sales of O2 OPTIX® lenses in the United States in 2013.  Alcon ensures that O2 OPTIX® lenses are compliant with all of the applicable standards in the countries in which Alcon distributes them, but this does not include the United States because Alcon no longer distributes them in the United States.  Despite this, Defendants sell these lenses in the United States.



96.     Defendants' sales of products that are materially different from the FRESHLOOK® COLORBLENDS® products that Alcon sells in the United States will cause consumers to be confused, or to believe that the products sold by Defendants are the same as the FRESHLOOK® COLORBLENDS® products sold by Alcon in the United States, when they are not.  Further, Defendants' sales of unsupported O2 OPTIX® products in the United States will cause consumers to be confused, or to believe that the products sold by Defendants continue to be supported by Alcon in the U.S. market, when they are not.  As such, Defendants' sales of FRESHLOOK® COLORBLENDS® 2-packs and O2 OPTIX® products in the United States violate Sections 32 and 43(a) of the Lanham Act.

97.     By selling or distributing O2 OPTIX® and 2-pack FRESHLOOK® COLORBLENDS® products in the United States, a market in which Alcon does not offer the products, Defendants have removed the necessary transparency of the market.  If a recall or other notification to retailers, eye care practitioners, or patients were required, it would be more difficult for Alcon to effectively communicate the recall to all necessary parties.  Accordingly, Defendants' misconduct puts consumers at risk and jeopardizes Alcon's reputation and goodwill.

98.     Additionally, because O2 OPTIX® lenses are no longer sold in the United States, they are only tested for compliance with the local regulations of the countries in which Alcon distributes them.  Defendants' sales of Alcon lenses that have not been tested for U.S. regulatory compliance are likely to cause irreparable harm to Alcon and consumers because consumers will mistakenly assume that the Alcon lenses have been tested for regulatory compliance in the United States.  This severely negatively impacts the safety and well-being of contact lens consumers while also harming Alcon's reputation and goodwill.

ny-1324494

## FIRST CLAIM FOR RELIEF
## Trademark Infringement Under 15 U.S.C. § 1114

99.     Alcon repeats and realleges each allegation set forth in paragraphs 1 through 98 above as if fully set forth herein.

100.    The acts of Defendants described above constitute trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

101.    Alcon and its parent Novartis have valid and protectable rights in each of the registered ALCON Contact Lens Marks.  These rights predate Defendants' sales of DAILIES AQUACOMFORT PLUS® products that are materially different from the DAILIES AQUACOMFORT PLUS® products that Alcon has distributed in the United States since at least as early as May 2017, as well as Defendants' sales of discontinued O2 OPTIX® products and FRESHLOOK® COLORBLENDS® 2-packs in the United States.

102.    On information and belief, Defendants had actual knowledge of Alcon's ownership and use of the ALCON Marks prior to May 2017, of the change to the DAILIES AQUACOMFORT PLUS® packaging that would take place in May 2017, and of the fact that Alcon does not authorize sales of O2 OPTIX® or FRESHLOOK® COLORBLENDS® 2-pack in the United States.

103.    Alcon has not authorized Defendants to use any of the ALCON Contact Lens Marks in connection with the sale of any Alcon contact lens products.

104.    Defendants' unauthorized use of the registered ALCON Contact Lens Marks as alleged above is likely to cause confusion, mistake, or deception on the part of consumers as to the source, nature, and quality of the goods Defendants are offering under the registered ALCON Contact Lens Marks, constituting trademark infringement in violation of 15 U.S.C. § 1114.

35

105.    As a direct and proximate result of Defendants' wrongful conduct, Alcon has been, is now, and will continue to be irreparably injured and damaged by Defendants' aforementioned acts, and unless Defendants are enjoined by the Court, Alcon will suffer further harm to its name, reputation, and goodwill.  This harm constitutes an injury for which Alcon has no adequate remedy at law.

106.    On information and belief, Defendants have acted willfully to usurp Alcon's rights, and they should be held liable to Alcon for treble damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

<u>SECOND CLAIM FOR RELIEF</u>
**False Designation of Origin Under 15 U.S.C. § 1125(a)**

107.    Alcon repeats and realleges each allegation set forth in paragraphs 1 through 106 above as if fully set forth herein.

108.    The acts of Defendants described above constitute unfair competition and false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

109.    Alcon has valid and protectable rights in the ALCON Contact Lens Marks.  These rights predate Defendants' sales of DAILIES AQUACOMFORT PLUS® products that are materially different from the DAILIES AQUACOMFORT PLUS® products that Alcon has distributed in the United States since at least as early as May 2017, as well as Defendants' sales of discontinued O2 OPTIX® products, and FRESHLOOK® COLORBLENDS® 2-packs in the United States.

110.    On information and belief, Defendants had actual knowledge of Alcon's and Novartis's ownership and use of the ALCON Marks and the ALCON DAILIES AQUACOMFORT PLUS® Marks prior to May 2017, and of the change to the DAILIES AQUACOMFORT PLUS® packaging that would take place in May 2017.

36

111.    On information and belief, Defendants also had actual knowledge of Alcon's and Novartis's ownership and use of the O2 OPTIX® Marks, the CIBA VISION® mark, and the stylized CIBA VISION® mark prior to when Alcon discontinued selling those products in the United States, in approximately 2013.

112.    On information and belief, Defendants also had actual knowledge of Alcon's and Novartis's ownership and use of the FRESHLOOK® COLORBLENDS® Marks, the CIBA VISION® mark, and the stylized CIBA VISION® mark prior to when Defendants first sold the FRESHLOOK® COLORBLENDS® 2-packs in the United States.

113.    Defendants' unauthorized use of the ALCON Contact Lens Marks as alleged above is likely to cause consumers to believe that there is a relationship between Defendants and Alcon and/or that Defendants' products come from Alcon.  Such association constitutes false designation of origin, in violation of 15 U.S.C. § 1125(a).

114.    As a direct and proximate result of Defendants' wrongful conduct, Alcon has been, is now, and will continue to be irreparably injured and damaged by Defendants' aforementioned acts, and unless Defendants are enjoined by the Court, Alcon will suffer further harm to its name, reputation, and goodwill.  This harm constitutes an injury for which Alcon has no adequate remedy at law.

115.    On information and belief, Defendants have acted willfully to usurp Alcon's rights, with full knowledge of and intent to cause harm to Alcon, and Defendants should be held liable to Alcon for treble damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

**THIRD CLAIM FOR RELIEF**
**Deceptive Trade Practices Under New York General Business Law § 349**

116.    Alcon repeats and realleges each allegation set forth in paragraphs 1 through 115 above as if fully set forth herein.

ny-1324494

117.    The acts of Defendants described above constitute consumer-oriented deceptive trade practices under New York General Business Law § 349.

118.    Defendants' sales of DAILIES AQUACOMFORT PLUS® products in packaging that is materially different from the DAILIES AQUACOMFORT PLUS® product packaging that Alcon has distributed in the United States since at least as early as May 2017 have caused and will continue to cause specific and direct harm to consumers in New York and to the public interest.  The sale or distribution of DAILIES AQUACOMFORT PLUS® lenses in the old packaging without U.S.-specific lot numbers, readily accessible detailed use instructions, a toll-free patient helpline and email address, a dedicated DAILIES® support website address, and the identifying American flag, harms consumers and impacts public safety by, among other things, reducing consumers' ability to access important safety and use information and impairing Alcon's quality control, consumer communication, and supply chain monitoring measures.

119.    Defendants' sales of O2 OPTIX® products that Alcon no longer distributes or supports in the United States have caused and will continue to cause specific and direct harm to consumers in New York and to the public interest.  Because Defendants are improperly selling or distributing O2 OPTIX® lenses in the United States, outside of Alcon's transparent distribution market, Defendants are harming consumers by impeding Alcon's ability to effectively communicate with consumers, eye care practitioners, and retailers in the event of a recall or other notification.  Additionally, because the O2 OPTIX® lenses are no longer tested for U.S. regulatory compliance, sales of these products in the United States are likely to cause irreparable harm to Alcon and its consumers because consumers will mistakenly assume that the Alcon lenses have been tested for compliance in the United States.

120.    Defendants' sales of FRESHLOOK® COLORBLENDS® 2-pack products that are materially different from the FRESHLOOK® COLORBLENDS® products that Alcon distributes in the United States have caused and will continue to cause specific and direct harm to consumers in New York and to the public interest.

121.    Because Defendants are improperly selling or distributing FRESHLOOK® COLORBLENDS® 2-pack lenses in the United States, outside of Alcon's transparent distribution market, Defendants are harming consumers by impeding Alcon's ability to effectively communicate with consumers, eye care practitioners, and retailers in the event of a recall or other notification.

122.    Lack of prescription verification in connection with some of AVG's shipments is a violation of the FCLCA and a consumer-oriented deceptive trade practice that has caused and will continue to cause specific and direct harm to consumers in New York and to the public interest.

123.    As a direct and proximate result of Defendants' wrongful conduct, Alcon has been, is now, and will be irreparably injured and damaged by Defendants' aforementioned acts, and unless Defendants are enjoined by the Court, Alcon will suffer further harm to its name, reputation, and goodwill.  This harm constitutes an injury for which Alco has no adequate remedy at law.

124.    On information and belief, Defendants have acted willfully to usurp Alcon's rights, with full knowledge of and intent to cause harm to Alcon.

**FOURTH CLAIM FOR RELIEF**
**False Advertising Under New York General Business Law § 350**

125.    Alcon repeats and realleges each allegation set forth in paragraphs 1 through 124 above as if fully set forth herein.

ny-1324494

126.    The acts of Defendants described above constitute false advertising under New York General Business Law § 350.

127.    Defendants' unauthorized use of the ALCON Contact Lens Marks as alleged above is likely to cause consumers to believe that there is a relationship between Defendants and Alcon and/or that Defendants' products come from Alcon.  Such association constitutes false advertising under New York General Business Law § 350.

128.    National Lens' advertisement of O2 OPTIX® products that are not distributed by Alcon in the United States deceives consumers into believing that such lenses are approved for sale in the United States.  Such materially misleading advertising is harmful to consumers as it leads them to believe the products they are purchasing are genuine, when instead National Lens is impairing Alcon's quality control, consumer communication, and supply chain monitoring measures.

129.    As a direct and proximate result of Defendants' wrongful conduct, Alcon has been, is now, and will continue to be irreparably injured and damaged by Defendants' aforementioned acts, and unless Defendants are enjoined by the Court, Alcon will suffer further harm to its name, reputation, and goodwill.  This harm constitutes an injury for which Alcon has no adequate remedy at law.

130.    On information and belief, Defendants have acted willfully to usurp Alcon's rights, with full knowledge of and intent to cause harm to Alcon.

## FIFTH CLAIM FOR RELIEF
### Trademark Infringement Under New York Common Law

131.    Alcon repeats and realleges each allegation set forth in paragraphs 1 through 130 above as if fully set forth herein.

ny-1324494

132.     The acts of Defendants described above constitute trademark infringement under the common law of the State of New York.

133.     As a direct and proximate result of Defendants' wrongful conduct, Alcon has been, is now, and will continue to be irreparably injured and damaged by Defendants' aforementioned acts, and unless Defendants are enjoined by the Court, Alcon will suffer further harm to its name, reputation, and goodwill.  This harm constitutes an injury for which Alcon has no adequate remedy at law.

**SIXTH CLAIM FOR RELIEF**
**Unfair Competition Under New York Common Law**

134.     Alcon repeats and realleges each allegation set forth in paragraphs 1 through 133 above as if fully set forth herein.

135.     The acts of Defendants described above constitute unfair competition under the common law of the State of New York.

136.     As a direct and proximate result of Defendants' wrongful conduct, Alcon has been, is now, and will continue to be irreparably injured and damaged by Defendants' aforementioned acts, and unless Defendants are enjoined by the Court, Alcon will suffer further harm to its name, reputation, and goodwill.  This harm constitutes an injury for which Alcon has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Alcon prays for judgment as follows:

1.     That judgment be entered in favor of Alcon and against Defendants on each and every Claim of this Complaint;

2.     For entry of an order and judgment requiring that Defendants and their respective officers, directors, members, agents, servants, employees, affiliates, parents, subsidiaries,

assigns, and successors in interest, and those persons acting in concert or participating with them, be enjoined during the pendency of this action and permanently thereafter from (a) using in any manner the ALCON Contact Lens Marks in connection with the sale of any product that is materially different from products that Alcon distributes in the United States, including but not limited to using the ALCON Contact Lens Marks in connection with the sale of any Alcon product for which the prescription has not been properly verified; (b) doing any act or thing calculated or likely to cause confusion or mistake in the minds of the members of the public or prospective customers as to the source of the products offered or distributed by Defendants, or likely to confuse members of the public, or prospective customers, into believing that there is some connection between Alcon and Defendants or any other entity owned by or associated with Defendants; (c) importing, distributing, or selling any Alcon contact lenses that may not comply with or be tested against U.S. regulatory standards, including but not limited to AIR OPTIX® plus HYDRAGLYDE® lenses, AIR OPTIX® Colors lenses, DAILIES TOTAL1® lenses, and O2 OPTIX® lenses; (d) importing, distributing, or selling any Alcon contact lenses that are materially different from those distributed by Alcon in the United States, including but not limited to DAILIES AQUACOMFORT PLUS® lenses, AIR OPTIX® plus HYDRAGLYDE® lenses, AIR OPTIX® Colors lenses, DAILIES TOTAL1® lenses, O2 OPTIX® lenses, and FRESHLOOK® COLORBLENDS® lenses in 2-packs; (e) importing, distributing, or selling contact lenses that Alcon does not distribute in the United States, including but not limited to O2 OPTIX® lenses; (f) distributing or selling any Alcon contact lenses for which prescriptions have not been verified; (g) otherwise competing unfairly with Alcon in any manner; or (h) assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in parts (a) through (g) of this paragraph 2;

ny-1324494

3.      For entry of an order and judgment directing Defendants, pursuant to 15 U.S.C. § 1116(a), to file with this Court and serve upon Alcon within thirty (30) days after entry of the injunction, a report in writing under oath setting forth in detail the manner and form in which Defendants have complied with the injunction and ceased selling Alcon products that are materially different from products that Alcon distributes in the United States, including but not limited to the sale of products bearing any of the ALCON Contact Lens Marks for which the prescription has not been properly verified, O2 OPTIX® products, DAILIES AQUACOMFORT PLUS® products that are materially different from the DAILIES AQUACOMFORT PLUS® products that Alcon distributes in the United States, AIR OPTIX® plus HYDRAGLYDE® products that are materially different from the AIR OPTIX® plus HYDRAGLYDE® products that Alcon distributes in the United States, AIR OPTIX® Colors products that are materially different from the AIR OPTIX® Colors products that Alcon distributes in the United States, and FRESHLOOK® COLORBLENDS® products that are materially different from the FRESHLOOK® COLORBLENDS® products that Alcon distributes in the United States;

4.      For entry of an order and judgment directing Defendants to disclose to Alcon all of Defendants' suppliers of Alcon products;

5.      For a judgment in the aggregate amount of (a) Defendants' profits, (b) Alcon's actual damages, (c) the costs of this action pursuant to 15 U.S.C. § 1117, and (d) restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of their unlawful, unfair, and/or fraudulent business acts or practices;

6.      That the Court award enhanced damages pursuant to 15 U.S.C. § 1117(a);

7.      That the Court award prejudgment interest on all amounts awarded;

ny-1324494

8.      That the Court award Alcon reasonable attorneys' fees; and

9.      That the Court award such other relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Alcon hereby demands trial by jury on all issues raised by the Complaint.

Dated: New York, New York
        April 27, 2018

MORRISON & FOERSTER LLP

By: /s/ Jamie A. Levitt
    Jamie A. Levitt
    250 West 55th Street
    New York, New York  10019
    Telephone: (212) 468-8000
    Facsimile: (212) 468-7900
    Email:  JLevitt@mofo.com

    Jennifer Lee Taylor (*Pro Hac Vice* application forthcoming)
    425 Market Street
    San Francisco, California  94105
    Telephone:  (415) 268-7000
    Facsimile:  (415) 268-7522
    Email:  JTaylor@mofo.com

    Attorneys for Plaintiff
    ALCON LABORATORIES, INC.

ny-1324494